[No. A071307. First Dist., Div. Five. May 31, 1996.]

MARY STATEN et al., Petitioners, v.
THE SUPERIOR COURT OF ALAMEDA COUNTY, Respondent;
MARIE BAFUS et al., Real Parties in Interest.

**Counsel**

Low, Ball & Lynch, Dean M. Robinson, Stephen G. Castronova, Severson & Werson, Jan T. Chilton, Michael B. Murphy and David A. Ericksen for Petitioners.

No appearance for Respondent.

Murray & Associates and Lawrence D. Murray for Real Parties in Interest.

**Opinion**

KING, J.—In this case we apply *Knight* v. *Jewett* (1992) 3 Cal.4th 296 [11 Cal.Rptr.2d 2, 834 P.2d 696] to the sport of figure skating. We conclude that being cut by the blade of another skater during a group skating session is an inherent risk of the sport. The injured skater cannot recover for personal injuries under the doctrine of primary assumption of risk.

Petitioners are the various defendants in a personal injury action brought by real party in interest, plaintiff Marie Bafus, who was cut on the arm when she collided with another figure skater, petitioner Mary Staten. Petitioners moved for summary judgment on the ground that *Knight* barred real party's

recovery. The superior court denied the motion, and petitioners seek writ review. Having issued an order to show cause in lieu of an alternative writ and heard oral argument, we issue the peremptory writ of mandate to compel the superior court to grant summary judgment in petitioners' favor.

## I. FACTS

Real party in interest Marie Bafus is an experienced and accomplished amateur figure skater. She began skating when she was three or four years old and has skated competitively since the age of eleven. Bafus, who was 16 at the time of the accident giving rise to this litigation, aspired to Olympic competition or a career with the Ice Capades. She knew that skate blades were sharp, and that falls and collisions with other skaters were among the risks of figure skating. She knew skating carried with it a risk of personal injury.

Bafus practiced at Berkeley Iceland, a skating rink owned by East Bay Iceland, Inc. She was a member of the St. Moritz Skating Club, which rented the rink at specified times when the rink would exclude the public and allow only the club members to skate.

During one of the skating club's practice sessions, at which there were about 10 skaters skating freestyle around the ice for a 45-minute period, defendant Mary Staten, also a club member and aspiring figure skater, was practicing an "outward backward spiral." This maneuver required Staten to skate backwards on the ice with one leg extended and roughly parallel to the ice. While skating backward Staten collided with Bafus, who was in a stationary position practicing 360-degree spins. Bafus instinctively raised her arm when she saw Staten coming, and was cut on the arm by the blade of Staten's elevated skate.

Bafus sued Staten; her parents, John and Katrina Staten; the St. Moritz Skating Club; and East Bay Iceland, Inc. The defendants moved for summary judgment on the ground of primary assumption of risk.[1] The trial court denied the motion, specifically ruling there was a triable issue of material fact on the question whether such an injury as suffered by the plaintiff was an inherent risk in figure skating. In reaching its ruling the trial court, over defense objection, relied on the declaration of an expert figure skater, who stated his opinion that being cut by the blade of a skater performing a backward spiral is not an inherent risk of the sport. The expert opined: "a

---

[1]Bafus also sued Mary Staten's skating coach, Kathy Adams. It is not clear whether Adams formally moved for summary judgment. She did appear through counsel at oral argument below.

backward spiral[] requires the use of care to look in the direction that one is going to travel, before the travel begins, to make sure that the ice is free of objects such as walls, etc., including people. The failure to do so is negligent on the part of the skater."[2]

## II. DISCUSSION

Motivated by a desire to clarify the law of assumption of risk in California, the Supreme Court decided *Knight* and its companion case, *Ford* v. *Gouin* (1992) 3 Cal.4th 339 [11 Cal.Rptr.2d 30, 834 P.2d 724, 34 A.L.R.5th 769]. Although neither opinion commanded a clear majority of the court, *Knight* has become the operative statement of current California law.[3] ■ *Knight* distinguished between cases of primary assumption of risk, in which a defendant owes no duty to protect the plaintiff from a particular risk of harm, and cases of secondary assumption of risk, in which the defendant does owe a duty of care but the plaintiff knowingly encounters the risk. (*Knight* v. *Jewett, supra*, 3 Cal.4th at p. 308.) In the latter situation, liability is apportioned by comparative fault. (*Id.* at p. 310.) In the former, the lack of a duty of care operates as a complete bar to recovery, without regard to whether the plaintiff's conduct was reasonable or unreasonable, and without regard to the plaintiff's subjective awareness or understanding of the potential risk. (*Id.* at pp. 309-310, 314-316.)

■ Generally, the participation in an active sport is governed by primary assumption of risk, and a defendant owes no duty of care to protect a plaintiff against risks inherent in the sport. (*Knight* v. *Jewett, supra*, 3 Cal.4th at pp. 315-316, 320.) In a given active sport setting, the question whether the defendant owes a duty to the plaintiff "is a *legal* question which depends on the nature of the sport or activity in question and on the parties' general relationship to the activity, and is an issue to be decided by the court, rather

---

[2]The expert's declaration is not a model of clarity. Bafus often claims the expert stated that a skater doing a backward spiral is supposed to be looking backward during the maneuver, as well as at its outset. This is an overly expansive reading of the declaration. The expert only said the skater should check her path before beginning. Bafus testified at her deposition that a backward-spiraling skater is supposed to be "looking over their shoulder" but her testimony is unclear as to whether they are supposed to do so during the entire maneuver or just before it.

[3]*Knight* has been followed by a host of Court of Appeal decisions, not always without an observation such as this one: "In *Ford*, Justice Arabian authored a lead opinion in which no other justice joined. In *Knight*, Justice George penned the lead opinion in which Chief Justice Lucas and Justice Arabian concurred. Justice Mosk provided a majority vote with a concurring opinion that agreed for the most part with the lead opinion. [Citation.] Because *Knight* commands a strong plurality, and because it speaks generally to the doctrine of . . . assumption of . . . risk, we will follow *Knight* here." (*Davis* v. *Gaschler* (1992) 11 Cal.App.4th 1392, 1397 [14 Cal.Rptr.2d 679].)

than the jury. [Citation.] Thus, the question of assumption of risk is much more amenable to resolution by summary judgment under a duty analysis . . . ." (*Id.* at p. 313.) Thus, under *Knight* a trial court is to determine the question of duty as a function of the scope and definition of a given active sport's inherent risks.

In many active sport cases, this principal determination of the question of duty leads to a second duty analysis. Although a defendant owes no duty to protect against the risks inherent in a sport, the defendant generally owes a duty not to *increase* the risks of the activity beyond the risks inherent in the sport. (*Knight* v. *Jewett, supra*, 3 Cal.4th at pp. 315-316.) This second determination of duty, however, still hinges upon the trial court's determination of the question of duty in the first instance, by defining the risks inherent in the sport at issue.

■ In the present case, we must determine whether being cut by the blade of a fellow skater during a group skating session is, as a matter of law, a risk inherent in the sport of figure skating. Bafus, however, would have us put down our pen at this point, on the theory that *Knight* does not even apply. Bafus claims that *Knight* applies only to contact sports, and not to what she designates "solo" figure skating. We must observe that Bafus's adoption of the phrase "solo figure skating" is a semantic trick: if Bafus had been skating alone, she would never have been injured at all. Bafus was skating a practice session with a number of other skaters, all engaged in bettering themselves in an active sporting activity, and whose proximity to one another created certain risks of collision.[4]

It is well settled that *Knight* applies to so-called noncontact competitive sports, as well as contact team sports such as football or baseball. (See, e.g., *Connelly* v. *Mammoth Mountain Ski Area* (1995) 39 Cal.App.4th 8 [45 Cal.Rptr.2d 855] [snow skiing]; *Ford* v. *Gouin, supra*, 3 Cal.4th 339 [waterskiing]; *Stimson* v. *Carlson* (1992) 11 Cal.App.4th 1201 [14 Cal.Rptr.2d 670] [sailing]; *Yancey* v. *Superior Court* (1994) 28 Cal.App.4th 558 [33 Cal.Rptr.2d 777] [discus throwing].)

*Knight* itself suggests, in passing, that skating should be covered by its doctrine of primary assumption of risk. (*Knight* v. *Jewett, supra*, 3 Cal.4th at

---

[4]Relying only on a depublished decision, Bafus argues that *Knight* does not apply because she was merely practicing and not actually competing at the time of her injury. The distinction eludes logic. Like rehearsals in drama, practice is essential to competitive athletic activity. One assumes the risks inherent in an active sporting activity by participating in it, regardless of whether the participation is practice or formal competition. To accept Bafus's distinction would make assumption of risk hinge upon the formality of the activity, not the activity itself. Needless to say the distinction is unsupported by any valid authority.

pp. 319, 320, fn. 7.) It also cites with approval the Minnesota case of *Moe* v. *Steenberg* (1966) 275 Minn. 448 [147 N.W.2d 587, 33 A.L.R.3d 311], which held that collisions with other skaters were an inherent risk in ice skating. (147 N.W.2d at p. 589, citing *Schamel* v. *St. Louis Arena Corporation* (Mo.Ct.App.1959) 324 S.W.2d 375, 378 [collisions with other skaters an inherent risk of roller skating].) The plaintiff in *Moe* was held to have assumed the risk "that anyone skating backwards, whose vision and control were momentarily impaired, would constitute a special hazard" which the plaintiff should have anticipated. (*Ibid.*; *accord*, Annot., Liability of Ice Skater For Injury to Another Skater (1970) 33 A.L.R.3d 316.) If figure skating may be analogized to snow skiing, another sport in which one acts alone and "teamless" but in the proximity of others also so engaged, the skiing cases uniformly hold that one skier assumes the risk of collision with another. (See *O'Donoghue* v. *Bear Mountain Ski Resort* (1994) 30 Cal.App.4th 188, 193 [35 Cal.Rptr.2d 467]; Annot., Skier's Liability For Injuries to or Death of Another Person (1969) 24 A.L.R.3d 1447 [concluding, relying in part on *McDaniel* v. *Dowell* (1962) 210 Cal.App.2d 26 [26 Cal.Rptr. 140], that colliding with another skier is an inherent risk of the sport].)

We thus agree with petitioners that collisions with other skaters in group skating sessions, and the injuries that may result therefrom, are inherent risks of the sport of figure skating.[5] Bafus insists, however, that being cut by the blade of a backward-moving skater is not an inherent risk of the sport. Bafus contends that Staten had a duty to check that her route was clear before she began her backward spiral. Bafus relies heavily on *Yancey* v. *Superior Court*, *supra*, which held that a discus thrower had a duty to check that the path of the projectile was clear before throwing it, and that it was not an inherent risk of the sport to be injured by a thrower who violated that duty. The fluidity of figure skating distinguishes the present case from *Yancey*, in which only one competitor threw a discus at a given time and into a defined area. *Yancey* analogized discus to golf; figure skating is more analogous to snow skiing, where the fluidity of action and the presence of others renders the risk of collision inherent.

Bafus also relies heavily on the declaration of her expert witness, quoted above. Petitioners contend the declaration was inadmissible on the legal question of duty, and should not have been considered by the trial court. For the reasons that follow, we agree with petitioners.

This case illustrates a problem that can arise in primary assumption of risk cases, which may not have been fully appreciated by *Knight*. As we see it,

[5] This would be true regardless of whether the group skating was practice for skating competition or is merely recreational.

*Knight* may require a court to determine a question of duty in sports settings while factually uninformed of how the sport is played and the precise nature of its inherent risks.

Under *Knight* "inherent risk" defines duty. The question of duty is, as *Knight* reminds us, a legal question to be determined by the court. (*Knight* v. *Jewett, supra,* 3 Cal.4th at p. 313; *Ballard* v. *Uribe* (1986) 41 Cal.3d 564, 572-573, fn. 6 [224 Cal.Rptr. 664, 715 P.2d 624].) The determination of duty "depends on the nature of the sport or activity in question and on the parties' general relationship to the activity." (*Knight* v. *Jewett, supra,* 3 Cal.4th at p. 313.) However, " '[I]t is thoroughly established that experts may not give opinions on matters which are essentially within the province of the court to decide.' [Citations.]" *Sheldon Appel Co.* v. *Albert & Oliker* (1989) 47 Cal.3d 863, 884 [254 Cal.Rptr. 336, 765 P.2d 498].) It seems, then, that in *Knight* the Supreme Court has determined that legal questions of duty in primary assumption of risk cases are to be resolved by the trial court without factual input by experts. The determinant of duty, "inherent risk," is to be decided solely as a question of law and based on the general characteristics of the sport activity and the parties' relationship to it. This determination is necessarily reached from the common knowledge of judges, and not the opinions of experts.

It seems to us that *Knight* has crammed a square peg of fact into the round hole of legal duty: whether there is or is not a duty in a primary assumption of risk case turns on the question whether a given injury is within the "inherent" risk of the sport, which in turn can only be determined on a set of factual conceptions of the particular sport and how it is played. This works fine with regard to sports which are themselves a matter of common knowledge. We all grew up with baseball and football; some of us have skated, skied, or sailed. But what of sports such as, say, synchronized swimming, Olympic pentathlons, or parasailing? If a given trial (or appellate) judge has no general knowledge of the sport in question, he or she necessarily has to get a factual grasp of the nature of the sport from somewhere other than general knowledge, and that seems to open the door to the court's reliance on expert testimony or opinion. Or at least on something: in *Wattenbarger* v. *Cincinnati Reds, Inc.* (1994) 28 Cal.App.4th 746, 753 [33 Cal.Rptr.2d 732], the Court of Appeal cited The Oxford Companion to World Sports and Games to buttress its legal conclusion that baseball pitching bears the inherent risk of arm injury.[6]

We are still faced, however, with the rule against expert testimony on the question of duty. This has been overlooked in several post-*Knight* decisions.

---

[6]In a pre-*Knight* case which is often cited in recent primary assumption of risk cases involving skiing, the court (in deciding duty under *Rowland* v. *Christian* (1968) 69 Cal.2d 108 [70 Cal.Rptr. 97, 443 P.2d 561, 32 A.L.R.3d 496]) enhanced its information on the hazards of

Another division of this district appeared to rely on the declaration of an expert when it concluded, in upholding a grant of defense summary judgment, that being hit by a swinging boom is an inherent risk of sailing. (*Stimson* v. *Carlson, supra,* 11 Cal.App.4th at p. 1204, fn.1.) However, the use of such expert testimony was not at issue in *Stimson,* and the case does not stand for the proposition that expert testimony is admissible on the issue of inherent risk. Still other decisions have assumed, without discussion, that expert testimony is admissible for the second analysis of duty, in which the inherent risks of a sport are determined by the court as a legal issue but the plaintiff seeks to prove the defendant increased the risk. Courts apparently turn to the expert opinion on the question of increased risk because the issue is often one of whether the defendant has provided the plaintiff with safe or safely designed equipment. (See *Freeman* v. *Hale* (1994) 30 Cal.App.4th 1388, 1396, fn. 5 [36 Cal.Rptr.2d 418] [consumption of alcohol by skiers increases risks of collisions with other skiers]; *Ferrari* v. *Grand Canyon Dories* (1995) 32 Cal.App.4th 248, 255-257 [38 Cal.Rptr.2d 65] [certain whitewater raft design did not increase risk to passengers beyond that inherent in the sport]; *Branco* v. *Kearny Moto Park, Inc.* (1995) 37 Cal.App.4th 184, 193 [43 Cal.Rptr.2d 392] [bicycle jump may have been unsafely designed in such a way as to increase the inherent risk of bicycle racing].)

The Supreme Court has fashioned the rule of *Knight* and propelled sports injury cases onto the playing fields of summary judgment, which, as we all know, are hardly Elysian. The Supreme Court would do well to provide further guidance by clarifying the rule book. Trial courts deciding these questions on summary judgment should not be faced with determining the inherent risks of an unfamiliar sport while bereft of the helpful factual input of experts. We suppose that a trial judge could receive expert evidence on the factual nature of an unknown or esoteric sports activity, but not expert evidence on the ultimate legal question of inherent risk and duty. This, however, is not our call: it is for the Supreme Court, in baseball parlance, to declare this suggestion fair or foul.

### III. DISPOSITION

Let a peremptory writ of mandate issue commanding respondent superior court to vacate its order denying summary judgment and to enter a new and

---

skiing by referring to a Michigan statute which listed those hazards. (*Danieley* v. *Goldmine Ski Associates, Inc.* (1990) 218 Cal.App.3d 111, 123 [266 Cal.Rptr. 749] [quoting Mich. Stat. Ann. § 18.483(22)(2)].)

different order granting summary judgment to petitioners. Each side shall bear its own costs of this writ proceeding.

Peterson, P. J., and Haning, J., concurred.

A petition for a rehearing was denied June 24, 1996, and the petition of real parties in interest for review by the Supreme Court was denied August 21, 1996. Mosk, J., was of the opinion that the petition should be granted.